# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

| | |
|---|---|
| **In Re:**<br><br>JAMES LOWELL<br>SNODGRASS,<br><br>        **Debtor.** | **Bankruptcy Case<br>No. 05-03216** |

_____

| | |
|---|---|
| UNITED STATES TRUSTEE,<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>JAMES LOWELL<br>SNODGRASS,<br><br>        **Defendant.** | **Adv.  Proceeding<br>No. 06-6020** |

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

James Lowell Snodgrass, Ontario, Oregon, Pro Se Plaintiff.

Jeffrey G. Howe, Boise, Idaho, Assistant U.S. Trustee**,** Attorney for
Defendant.

The Plaintiff United States Trustee ("UST") commenced this

MEMORANDUM OF DECISION - 1

adversary proceeding requesting an order denying the chapter 7[1] debtor James

Lowell Snodgrass ("Defendant") a discharge pursuant to §§ 727(a)(2)(A),

(a)(2)(B), and (a)(4)(A).  Docket No. 1.  The Court conducted a trial in the action

on December 14, 2006 at which the parties appeared and presented evidence and

testimony, and submitted oral arguments.  After duly considering the evidence,

testimony and arguments, the Court concludes Defendant is not entitled to a

discharge.  The following Memorandum constitutes the Court's findings of fact

and conclusions of law.  Fed. R. Bankr. P. 7052.

### *Findings of Fact*[2]

### I.

Defendant is an inmate incarcerated at the Oregon State Correction

Institution in Ontario.  He commenced his chapter 7 bankruptcy case on August 8,

2005.  Bankr. Case No. 05-03216, Docket No. 1.  Defendant was not represented

by an attorney, and completed the required petition, schedules and statements on

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001– 9036, in effect prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

[2] These findings include both disputed and undisputed facts.  In deciding disputed issues of fact, the Court carefully considered the testimony of the witnesses, and based upon its opportunity to observe them testify, assessed their credibility.  The Court's findings reflect its judgment on the weight to be given to that testimony.

MEMORANDUM OF DECISION - 2

his own.  On his Schedule I, Defendant indicated he was receiving a $428.00

monthly social security benefit and a $389.00 monthly payment from a pension

earned while employed by the State of Oregon.  Sched. I, Ex. 2.  In his Statement

of Financial Affairs, Defendant represented that the $428.00 social security benefit

was paid directly to his two minor children.  Stmt. Fin. Affairs, Ex. 2.  Defendant

did not disclose any additional sources of income.

   Richard Crawforth ("Trustee") was appointed to serve as chapter 7

trustee in Defendant's bankruptcy case.  From his review of the schedules, Trustee

determined there would be no assets available for distribution to Defendant's

creditors.  Trustee conducted a § 341 meeting of creditors at which Defendant

testified by telephone.  During this meeting, while under oath, Defendant

acknowledged he had signed the bankruptcy documents he had submitted in

connection with his case, and that the documents he filed were true and correct.

Meeting of Creditors Transcript 5:3-16, Ex. 7.

   Trustee was later contacted by counsel for Standard Insurance

Company, who indicated that Standard Insurance had been making payments to

Defendant as a beneficiary under the terms of a group disability insurance policy

since 1998.  Standard Insurance believed the disability payments were being held

for Defendant in an account at Sterling Savings Bank.  Trustee investigated and

MEMORANDUM OF DECISION - 3

discovered Defendant indeed held a certificate of deposit in the amount of

$18,477.93, and a savings account with a balance of $3,079.58, at that bank.

Trustee made a demand to the bank for the funds, which are now held in his trust

account.

On November 18, 2005, Standard Insurance commenced an

adversary proceeding against Debtor, seeking a nondischargeable judgment

against Defendant in the amount of $66,274.19, the amount of disability payments

which Standard Insurance alleges Defendant wrongfully received while

incarcerated under § 523(a)(2).  Standard also requested that the Court deny

Defendant a discharge pursuant to § 727(a).  Compl., Adv. No. 05-6067, Docket

No. 1.

On November 21, 2005, Melissa Parsley commenced an adversary

proceeding against Defendant seeking a declaration that a pre-bankruptcy state

court money judgment she holds against him constitutes a debt excepted from

discharge in bankruptcy under § 523(a)(6).  Pursuant to an arrangement previously

negotiated between Defendant and Ms. Parsley, Defendant agreed to direct that the

Public Employees Retirement System ("PERS") pay his monthly benefits to Ms.

Parsley until the money judgment was paid in full.  Defendant now maintains this

settlement is illegal and unenforceable, and has declined to set up the account to

MEMORANDUM OF DECISION - 4

pay Ms. Parsley.   Preventing the collection of this money judgment appears to be

the primary reason Defendant sought bankruptcy relief.

## II.

Based upon the documentary and evidentiary record, and to better

understand the material events that have transpired, the Court will set forth the

additional facts in chronological order.

Defendant, while at work for the State of Oregon, was involved in

an automobile accident on January 11, 1996.  Ex. Y-3.  Around the same time, and

apparently unrelated to the automobile accident, serious criminal charges were

filed against Defendant.  Presumably to cope with his incarceration, on March 15,

1996, Defendant executed a power of attorney in favor of a friend, Joan Haller, to

enable Ms. Haller to "act in all regards to my personal affairs."  Ex. 10.  Defendant

testified that during this time period he was suffering the effects of head injuries

received in the accident that prevented him from managing his own financial

affairs.

On August 27, 1996, Defendant received a letter from Standard

Insurance informing him that his claim for short term disability benefits under his

employer's policy had been denied.  Ex. 21A.  The letter explained that, under the

terms of the insurance policy, Defendant was not eligible for benefits while

MEMORANDUM OF DECISION - 5

incarcerated. *Id.* On August 28, 1996, Defendant responded to Standard

Insurance with a letter acknowledging that he had been incarcerated from January

31, 1996 through April 26, 1996, but asserting that although he was not entitled to

short term benefits, he believed he should receive long term disability benefits

from the date he was released from jail. Ex. 21B. This letter was signed by both

Defendant and his daughter, who Defendant testified was caring for him due to the

injuries he sustained in the January accident. Of course, and contrary to the letter,

Defendant had not been released from jail in April. On December 10, 1996,

apparently in response to Defendant's letter request, Standard Insurance

commenced payment of monthly long term disability benefits to Defendant. *See*

Ex. 21C. On May 30, 1998, Defendant sent another letter to Standard Insurance

requesting that his benefit checks be mailed to a new address, a post office box in

Jefferson, Oregon. Ex. 21D. He did not mention in this letter that he was still in

jail.

In the Spring of 1998, Defendant was sentenced by the Oregon state

court to serve a prison term extending through 2012. On July 10, 1998, Defendant

sent a letter, along with a power of attorney, to another friend, Randy Blair, asking

him, presumably in conjunction with Ms. Haller, to handle his financial affairs.

Ex. V-1. In addition, Defendant requested that Mr. Blair use the money paid to

MEMORANDUM OF DECISION - 6

him by  Standard Insurance to repay a debt owed by Defendant to Mr. Blair and

Ms. Haller.  *Id.*  It is not clear what role Mr. Blair played thereafter, as it was Ms.

Haller who handled the disability checks from Standard Insurance when they

arrived in the post office box.  However, Ms. Haller testified by deposition that

Defendant never owed her any money and that she simply agreed to handle

financial matters while Defendant was incarcerated.  Depo. of Joan Haller at 6–8,

Docket No. 26.

Defendant contends that through this 1998 letter he assigned his

interest in the disability payments to Haller.  Defendant also points to a letter

written to him in March 2005 by Ms. Haller, to support his position.  In this letter,

Ms. Haller indicates that she repaid the money she owed Defendant to his account.

Ex. A-8.  Defendant argues this indicates there was a loan between himself and

Ms. Haller; however, the letter makes it clear it was Defendant who loaned money

to Ms. Haller that she repaid, not the other way around.  Other than the letter to

Mr. Blair, there is no additional documentary evidence to support Defendant's

contention that he assigned his disability payments to Ms. Haller to repay a loan

she had made to him.

In August 1998, Ms. Haller, signing on behalf of Defendant, filled

out and returned a Standard Insurance form indicating Defendant's medical

MEMORANDUM OF DECISION - 7

condition still prevented him from working, and that the post office box was still

Defendant's current address.  Ex. 21E.  Defendant reaffirmed his disability

prevented him from working in February 2001 and June 2003, when he personally

filled out forms for Standard Insurance.  Ex. 21F; 21G.  Of course, Defendant was

imprisoned in Ontario during this entire period of time, and presumably not

eligible to receive insurance benefits.

        In January 2003, Defendant wrote to Ms. Haller asking her about the

balance in his bank account, and about the amount of the monthly disability

payments from Standard Insurance.  Ex. B-6.  On February 21, 2003, Defendant

again wrote to Ms. Haller as follows:  "When you get a chance let me know the

balance of my accounts [and] the amount I receive each month.  I'd like to know

about how much I have in my nest egg!"  Ex. B-8.  In March 2003, Defendant

again asked Ms. Haller about the balance of his accounts and the amount of money

he received each month.  Ex. B-10.  In March 2003, Ms. Haller responded to

Defendant's letters by indicating the amount he had in his accounts and asking

him how long she could tie up the funds in order to obtain a better interest rate.

Ex. A-4.  In June 2003, Ms. Haller sent Defendant a statement from Sterling

Savings Bank indicating there was $5,018.25 in one of Defendant's accounts.  Ex.

A-5.

MEMORANDUM OF DECISION - 8

On August 19, 2004, approximately a year before Defendant filed for bankruptcy relief, Defendant wrote to Ms. Haller and informed her that he was considering filing for bankruptcy. Ex. B-13. On September 11, 2004, Defendant requested by letter that Ms. Haller send him $300, and then an additional $300 in November. Ex. 11. Again in October 2004, Defendant requested that Ms. Haller send him $300 as quickly as she could, and to send another $300 "around the middle to the last of November." Ex. 12. There are corresponding deposits of $300 into Defendant's prison trust account on October 18, 2004, November 2, 2004 and November 24, 2004. Trust Account Stmt at 3–4, Ex. 9.

On March 3, 2005, a few months prior to the filing of his bankruptcy petition, Defendant wrote to Ms. Haller, "[t]hanks also for the Standard Insurance info. This gives me a better idea of what is happening." Ex. 13. In addition, in the letter, Defendant requests that Ms. Haller send $500 to his trust account. *Id.* A $500 deposit into the trust account was made on March 14, 2005. Trust Account Stmt at 6, Ex. 9.

Defendant wrote to Ms. Haller again on April 15, 2005, requesting she send him $363 so that he could file a chapter 7 bankruptcy petition, as well as to pay additional legal fees to file a state court appeal. Ex. 14. A deposit for $393 from Joan Haller appears in the trust account on May 2, 2005. Trust Account Stmt

MEMORANDUM OF DECISION - 9

at 8, Docket No. 9.

Based upon this course of events, the Court has no doubt that Defendant understood that the Sterling bank accounts contained his money, that Ms. Haller was maintaining the bank accounts on his behalf, and that when Defendant requested money, Ms. Haller sent it to him from the funds held in his bank accounts.  The prison trust account statement documents the various deposits into Defendant's trust account which in turn correspond in time and amount to Defendant's requests made to Ms. Haller.  *See* Trust Account Stmt, Docket No. 9.

Defendant first attempted to file his bankruptcy case in Oregon in June 2005.  Defendant testified at trial that the petition and schedules were returned to him because the Oregon bankruptcy court would not accept documents filled out in pencil.  Defendant, apparently correcting the problem, resubmitted his petition and schedules to the Oregon bankruptcy court, which were received on August 8, 2005.  Ex. 2.  Pursuant to a long-standing arrangement between the Districts of Idaho and Oregon, Defendant's bankruptcy petition and schedules were then transferred to Idaho for administration.  Ex. 1.

In August, 2005, Defendant informed Ms. Haller that he would be obtaining a copy of his prison trust account statement, and that he needed to show that he was indigent so he wanted to keep the balance low, but after he received

MEMORANDUM OF DECISION - 10

the copy, it would be necessary for her to send him some money.  Ex. 15.  On

September 12, 2005, Defendant sent a letter reminding Ms. Haller that he needed

money to be deposited in his trust account.  Ex. 17.

On September 18, 2005, Defendant sent a letter to Standard

Insurance informing the company that he believed it had underpaid his disability

benefits.  The letter states in part:

> You have been "offsetting" my Social Security
> Disability of $861.00/mo.  I have not received my
> Social Security Disability payment of $861.00/mo
> since June, 1998.  I have only received my Social
> Security Dependent payment of $428.00/mo.  My
> disability claim from you is $2,036.10/mo.  After the
> offsets you have been deducting, I receive
> $747.10/mo.  By my calculations you have made an
> error in not paying me the $861.00/mo from June,
> 1998 until 9-18-2005 (87 months + 18 days).  I would
> like this additional amount.

Ex. 21J.  Of course, the contents of this letter show that, as of September 18,

2005, Defendant was fully aware of that he had been receiving a substantial

benefit payment each month from Standard Insurance.

In a letter to Ms. Haller dated September 24, 2005, Defendant

thanked her for "re-mailing" the September 18 letter addressed to Standard

Insurance.  Ex. 18.  The letter goes on:

> You asked me what I wanted you to do with my
> money in the accounts.  Now that I have filed for

MEMORANDUM OF DECISION - 11

bankruptcy [and] it has been filed [and] is now in
effect, I can go ahead [and] put my money into some
type of a fairly long-term account in my name.[. . . ] Save some money out that
you can send me when I need a little so it all won't be tied-up in long term
investments.

Ex. 18.  Obviously, Defendant, at this point in time, considered the money in the

bank accounts from Standard Insurance to constitute his personal funds.

Four days after sending the above letter to Ms. Haller, on September

28, 2005, the § 341 meeting of creditors was held.  Defendant testified he signed

and submitted his schedules to the Court and that the information regarding his

assets and liabilities was true and correct.  While he was aware of them at the time,

Defendant did not disclose in either his schedules or his meeting testimony the

existence of the on-going Standard Insurance benefit payments, nor the funds on

hand in his bank accounts.  Ex. 7.

On November 1, 2005, Defendant filed a motion to amend his

schedules.  Ex. 3.  The motion consisted of explanations and documents as

opposed to the filing of a new schedule.  However, this information contained no

reference to either the monies received from Standard Insurance nor the bank

accounts.

The same day, November 1, 2005, Standard Insurance responded to

Defendant's September 18, 2005 letter requesting that it pay him additional sums

MEMORANDUM OF DECISION - 12

each month.  Ex. S-4.  Standard Insurance indicated it had been unaware, but had

now discovered, that Defendant had been incarcerated since April 27, 1998.  It

alleged that Defendant must have been aware that benefits under the disability

policy were not payable to him while he was incarcerated based upon the previous

correspondence sent to Defendant regarding the short term disability payments.

Standard Insurance alleged that Defendant had therefore been overpaid

$66,274.19.  In addition, Standard Insurance alleged that it was not aware

Defendant was eligible to receive payments from his PERS account, which

increased the amount of the overpayment to $75,623.14.  Defendant was notified

that a quality assurance unit representative would be reviewing his claim.  *Id.*

On November 18, 2005, Standard Insurance filed its adversary

proceeding seeking a judgment against him for the amounts overpaid, and to deny

Defendant a discharge.  *See* Docket No. 14, Ex. 1.  Standard Insurance again

contacted Defendant by letter dated November 21, 2005 and indicated it was

reserving its right to collect the overpayments.  Ex. S-6.  Additionally, on

November 21, 2005, Ms. Parsley filed her adversary proceeding against

Defendant.  Docket No. 16, Ex. 1.

On November 28, 2005, Defendant wrote to Ms. Haller as follows:

> Enclosed is a note you can take to [sic] Bank.  Put
> everything in your name.  We will consider it for

MEMORANDUM OF DECISION - 13

> "other considerations" as just pay off of past debt, that
> should of been done many yr's ago (over 3).  Close-
> out anything in my name.
>
> I have filed for bankruptcy.  Started this in mid-
> yr to try and protect my PERS from Mellisa [sic].
> Now Standard is trying to re-coup moneys paid to me.
> First they will have to "prove" that I owe them this
> debt.  They are trying to find any $ they might attach
> in the mean time.

Ex. 19.  By this letter, it is obvious Defendant was attempting to further conceal

the funds on deposit at the bank.

Finally, on January 11, 2006, Defendant wrote to Ms. Haller

explaining that two adversary proceedings had been filed against him in

connection with his bankruptcy case and that he wanted to protect his assets.

Defendant wrote:

> I want to do what O.J. Simson [sic] did in his civil suit
> after his criminal case.  He moved all his assets to
> Florida and even though he lost his civil case they
> could not collect anything from him in another state
> (especially FL which has some special rules on
> collection efforts).  I want you to move all my assets
> ($) to FL and this will put the first road-block in
> Standard's efforts.

Ex. 20.  The letter went on to advise, "[t]here is also some dollar amount that if

you stay under this figure, you don't have to report this transfer to the government.

We want to find out what this amount is and make all transfers under this amount

MEMORANDUM OF DECISION - 14

to prevent a 'trail.'" *Id.*

The UST commenced this adversary proceeding to deny Defendant a discharge on February 28, 2006. Docket No. 1.

On July 20, 2006, Defendant filed amended schedules to reflect the Sterling Savings Bank savings account and Certificate of Deposit. Ex. 4.

**III.**

Simply put, the Court finds Defendant lacks credibility and declines to believe Defendant's testimony or accept his explanations concerning the insurance benefit payments and funds in the bank accounts.

In particular, the Court finds as fact that Defendant did not assign the Standard Insurance disability payments to Ms. Haller as he suggests, but instead at all times considered the payments and money to be his own. Ms. Haller testified that she opened the Sterling Savings Bank accounts for Defendant because she had agreed to handle his financial affairs while he was unable to do so. Depo. of Joan Haller at 6–8, Docket No. 26. In addition, she testified that at no time did Defendant ever owe her any money or grant her a security interest in any of his assets. Depo. of Joan Haller at 6:17–7:14, Docket No. 26. The evidence indicates that Defendant, at least for the past several years, treated the Standard Insurance disability payments as his funds and considered the bank

MEMORANDUM OF DECISION - 15

accounts in which the funds were deposited to be his.  He exercised control over

the accounts by way of letters of instruction to Ms. Haller.  Defendant was aware

that he was receiving monthly disability payments from Standard Insurance in the

amount of $747.10 commencing in 1996 and continuing while he was imprisoned,

the proceeds of which were maintained in Sterling Savings Bank.

## IV.

Defendant contends that because of the injuries he sustained in the

1996 automobile accident, as well as the fact of his incarceration, he was not fully

aware of what funds he received from Standard Insurance, where those funds were

kept, nor did he know the balances of any bank accounts.  Defendant testified he

granted a power of attorney to Joan Haller and Randy Blair[3] to allow them to

handle his financial affairs.   In addition, Defendant claims he assigned the money

he was to receive from Standard Insurance to Ms. Haller and Mr. Blair to repay

them a debt he owed in 1998.  Defendant testified he believed he had assigned his

interest in the Standard Insurance policy proceeds to Ms. Haller and Mr. Blair,

therefore, he did not need to disclose the funds in the bank accounts or monthly

benefit payments in connection with the bankruptcy case.  Defendant indicated

---

[3]  Testimony suggested that there was a falling out between Defendant, Ms. Haller
and Mr. Blair.  The letters establish that it was Ms. Haller who handled Defendant's
disability payments from Standard Insurance and the bank accounts at issue in this
adversary proceeding.

MEMORANDUM OF DECISION - 16

that he had no knowledge or control of the Sterling Savings Bank accounts, but
when he gained an understanding of what had gone on with his money and bank
accounts, he amended his bankruptcy schedules.

The UST argues that Defendant concealed the true extent of his
assets and income both before and after filing his bankruptcy petition, and that he
knowingly and fraudulently made false oaths in connection with the bankruptcy
case.  The UST contends Defendant knew about the Standard Insurance disability
payments from the time the payments first began, and that he knew Ms. Haller was
keeping the money in bank accounts for him until he was released from prison.  It
is the UST's position that Defendant knew about the benefit payments and
accounts, but intended that they not be discovered during the bankruptcy.  On this
basis the UST seeks to deny Defendant a discharge.

### *Conclusions of Law*

### A.

The UST contends Defendant is not entitled to a discharge pursuant
to § 727(a)(2)(A) and (B) and § 727(a)(4)(A).  The Code provides that a Debtor
shall receive a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a
> creditor or an officer of the estate charged with
> custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has

MEMORANDUM OF DECISION - 17

> permitted to be transferred, removed, destroyed,
> mutilated, or concealed–
> (A) property of the debtor, within one year before the
> date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of
> the petition; . . .
>
> (4) the debtor knowingly and fraudulently, in or in
> connection with the case–
> (A) made a false oath[.]

11 U.S.C. § 727(a).

Objections to discharge under § 727 are to be liberally construed in favor of the debtor and strictly construed against the objecting party. *Bernard v. Sheaffer* (*In re Bernard*), 96 F.3d 1279, 1281 (9th Cir. 1996); *Weiner v. Perry, Settles & Lawson, Inc.* (*In re Weiner*), 208 B.R. 69, 71 (9th Cir. BAP 1997)). The burden of proof rests with the party objecting to the discharge. Fed. R. Bankr. P. 7005.

> However, despite this favorable construction,
> bankruptcy discharge is equitable in nature, and is
> intended only for honest debtors. *Bernard*, 96 F.3d at
> 1283.  And while this favorable construction attends,
> the objector must only prove the elements of the cause
> of action by a preponderance of the evidence; no
> heightened evidentiary burden is imposed.

*Palmer v. Downey* (*In re Downey*), 242 B.R. 5, 13 (Bankr. D. Idaho 1999) (citing *Grogan v. Garner*, 498 U.S. 279, 284 (1991); Fed. R. Bankr. P. 4005; *In re Lawler*, 141 B.R. 425, 429 (9th Cir. BAP 1992)).

MEMORANDUM OF DECISION - 18

**B.**

To deny Defendant a discharge under § 727(a)(2)(A), the UST must demonstrate two elements existed within the one year prior to the filing of Defendant's bankruptcy petition.  It must show  "1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property."  *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997).  The requisite intent may be inferred from the actions of the debtor or "may be established by circumstantial evidence, or by inferences drawn from a course of conduct."  *Fogal Legware of Switzerland, Inc. v. Wills* (*In re Wills*), 243 B.R. 58, 65 (9th Cir. BAP 1999) (quoting *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

Although the evidence indicates Defendant was well aware of the Standard Insurance disability payments and the corresponding bank accounts, he did not disclose them in connection with filing his bankruptcy petition.  However, after carefully reviewing the evidence submitted, there is no evidence to suggest that Defendant transferred the Standard Insurance payments and the bank accounts in the year prior to bankruptcy with the intent to hinder or defraud creditors.  While his post-petition conduct leaves no doubt as to his intent to conceal assets, there is no evidence that Defendant attempted or intended to conceal the assets

MEMORANDUM OF DECISION - 19

prior to filing, other than by his failure to disclose them in the bankruptcy

schedules.  Without evidence of a transfer coupled with an intent to defraud

creditors beyond his failure to disclose the assets, Defendant's discharge cannot be

denied on the basis of § 727(a)(2)(A).

## C.

However, § 727(a)(2)(B) requires that a discharge be denied to any

debtor who, "with the intent to hinder, delay or defraud a creditor or an officer of

the estate charged with custody of property under [title 11] . . ., has transferred,

removed . . . or concealed . . . property of the estate, after the date of the filing of

the petition[.]"  *Devers v. Bank of Sheridan, Montana* (*In re Devers*), 759 F.2d

751, 753 (9th Cir. 1985).  To prove its claim under this statute, the UST must

show Defendant acted with an actual intent to hinder, delay or defraud a creditor

or the trustee; evidence of constructive fraud will not support a denial of

discharge.  *Id.* (citing *In re Adlman*, 541 F.2d 999, 1003 (2d Cir. 1976)).  The

"fraudulent intent may be established by circumstantial evidence, or by inferences

drawn from a course of conduct."  *Id.* at 754 (citing *Farmers Co-op Assoc. v.*

*Strunk*, 671 F.2d 391, 395 (10th Cir. 1982)).  "Because a debtor is unlikely to

testify directly that his intent was fraudulent, the courts may deduce fraudulent

intent from all the facts and circumstances of a case."  *Id.* (citing *In re Nazarian*,

MEMORANDUM OF DECISION - 20

18 B.R. 143, 146 (Bankr. D. Md. 1982)).

Defendant's intent to conceal the funds he had received, and was receiving, from Standard Insurance from the bankruptcy trustee is clearly evident from his conduct. At the time of the filing of the bankruptcy, Defendant was aware that he was receiving a significant cash benefit payment each month from Standard Insurance, and that the monies were being held for him in bank accounts. This is evidenced in part by the September 18, 2005 letter he later sent to Standard Insurance, wherein he informs the company of his belief that he had been underpaid, and in which he states the amount he had been receiving each month. Ex. 21J.

Defendant wrote this letter a mere ten days prior to his § 341 meeting of creditors, yet at that meeting did not disclose he had been receiving the disability payments, or that he believed Standard Insurance owed him additional funds. In addition, just four days prior to the meeting of creditors, Defendant instructed Ms. Haller to "put my money into some type of a fairly long-term account in my name." Ex. 18. At this point in time Defendant acknowledged the money was his and that he intended to keep it from the bankruptcy estate. Defendant then fraudulently testified at the creditor's meeting that his schedules, which omit any mention of the payments or bank accounts, were true and correct.

MEMORANDUM OF DECISION - 21

Even when attempting to amend his bankruptcy schedules on November 1, 2005,

Defendant intentionally failed to include any reference to the money Ms. Haller

handled from Standard Insurance.

Defendant believed the money belonged to him.  This is shown by

the November 28, 2005 letter to Ms. Haller asking that she close-out all the

accounts in his name because Standard Insurance was attempting to recover the

disability overpayments made to Defendant.  Ex. 19.  Defendant told Ms. Haller to

take the money and that  "[w]e will consider it for 'other considerations' as just

pay off of past debt."  *Id.*  It is in this letter that Defendant mentioned for the first

time that he was giving the Standard Insurance money to Ms. Haller for the

express purpose of keeping the money away from Standard Insurance, a creditor.

Defendant's January 11, 2006, letter cements his intent to conceal the funds by

asking Ms. Haller to transfer his money to Florida, as O.J. Simpson did, to "put

the first road-block in Standard's efforts" to recover the funds.  Ex. 20.  Defendant

also indicated that Ms. Haller needed to make the transfer in small amounts to

ensure the transfers to Florida need not be reported to the government.  *Id*.  From

this, the Court infers and finds that Defendant intended to conceal the bank

accounts from the trustee, and to hopefully prevent Standard Insurance, his

creditor, from obtaining control of them.

MEMORANDUM OF DECISION - 22

The UST has shown by a preponderance of the evidence that Defendant knew these assets were his property, and through his conduct, he intended to conceal those assets from the bankruptcy trustee and a major creditor after the bankruptcy case had been filed.  The Court therefore concludes Defendant is not entitled to a discharge pursuant to § 727(a)(2)(B).

**D.**

"To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact." *Fogal Legware of Switzerland, Inc. v. Wills* (*In re Wills*), 243 B.R. 58, 62 (9th Cir. BAP 1999) (citing *In re Aubrey*, 111 B.R. 268, 274 (9th Cir. BAP 1990); *In re Ford*, 159 B.R. 590 (Bankr. D. Or. 1993)).  "A false oath may involve a false statement or omission in the debtor's schedules." *Id.* (citing *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992)).

"A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).  An omission relating to an asset that may be of little value to the estate is still "material if the omission or misstatement detrimentally affects administration of the estate." *Id.* at 63.

MEMORANDUM OF DECISION - 23

"A debtor's fraudulent intent may be established by circumstantial evidence or by inferences drawn from his or her course of conduct." *Id.*

Between 2003 and the filing of the bankruptcy petition in 2005, Defendant requested updates from Ms. Haller regarding the status of his bank accounts and Standard Insurance funds, which he referred to as his "nest egg." Defendant often received the requested information from Ms. Haller. *See* Exs. B-6; B-8; B-10; A-4; 13. On March 3, 2005, Defendant wrote to Ms. Haller and thanked her for the information regarding Standard Insurance and acknowledged that he now understood what was happening with the funds. Ex. 13. Defendant was, at the very least, aware that he was receiving monthly benefits from Standard Insurance and that these monies were being deposited in accounts maintained on his behalf. Although Defendant knew about the Standard Insurance disability payments and bank accounts, he failed to disclose that information in his bankruptcy schedules.

Defendant personally signed his bankruptcy schedules under penalty of perjury. He testified at the § 341 creditors' meeting, again under oath, that his schedules were true and correct and that all of his assets were disclosed. Defendant argues he thought there was only a small amount of money, $1,069 to be exact, in the accounts at that time. Defendant maintains he simply did not

MEMORANDUM OF DECISION - 24

know there was over $20,000 in his Sterling Savings Bank accounts. However, the case law is clear that a false oath, even involving a relatively small amount of assets, is material for the purpose of measuring Defendant's entitlement to a discharge under § 727(a)(4)(A). Indeed, Defendant's own explanation demonstrates he was aware of the accounts, but that he knowingly chose not to disclose them in connection with his bankruptcy case.

The false oath impacted the administration of the case. Prior to discovery of the accounts, the chapter 7 trustee acted under the impression that the bankruptcy estate had no assets available for creditors. The trustee was required to obtain information regarding Defendant's assets from other sources to enable him to capture those assets, administer the estate, and fulfill his duties. Defendant's signature on the bankruptcy schedules omitting any reference to the benefit payments and bank accounts, coupled with his later testimony at the creditors' meeting that those schedules were correct and complete, constitute a false oath. Defendant's discharge must also be denied pursuant to § 727(a)(4)(A).

## *Conclusion*

Defendant must be denied a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2)(B) and § 727(a)(4). Defendant intentionally concealed assets from the trustee and his creditors after filing for bankruptcy relief. He also made

MEMORANDUM OF DECISION - 25

false oaths regarding the existence and extent of his assets that adversely impacted

the administration of his bankruptcy estate.

A separate judgment will be entered.

Dated: January 23, 2007

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 26